Christopher Sproul (Bar No. 126398)
Environmental Advocates
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email: csproul@enviroadvocates.com

Fredric Evenson (State Bar No. 198059)
Ecology Law Center
P.O. Box 1000
Santa Cruz, CA 95061
Telephone: (831) 454-8216
Facsimile: (415) 358-5695
Email: evenson@ecologylaw.com

Drevet Hunt (State Bar No. 240487)
Lawyers for Clean Water, Inc.
1004 O'Reilly Avenue, Suite A
San Francisco, CA 94121
Telephone: (415) 813-6686
Email: drev@lawyersforcleanwater.com

Jason R. Flanders (State Bar No. 238007)
Amanda M. Prasuhn (State Bar No. 306718)
AQUA TERRA AERIS LAW GROUP
828 San Pablo Avenue, Suite 115B
Albany, CA 94706
Telephone: (916) 202-3018
Email: jrf@atalawgroup.com

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION, a non-profit corporation, | Civil Case No. 16-cv-06987-JD |
| Plaintiff, | **NOTICE OF MOTION; MOTION; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| FEDERAL EMERGENCY MANAGEMENT AGENCY, an agency of the Department of Homeland Security, | Hearing Date/Time: TBD<br>Hon. James Donato |
| Defendant. | |

# TABLE OF CONTENTS

**NOTICE OF MOTION AND MOTION** .................................................................. 1

**RELIEF REQUESTED** ........................................................................................... 1

I.    INTRODUCTION AND STATEMENT OF ISSUES ....................................... 1

II.   STATUTORY AND REGULATORY BACKGROUND ................................... 2

    A.    Endangered Species Act .......................................................................... 2

    B.    National Flood Insurance Act and the National Flood Insurance Program ................... 3

III.  STATEMENT OF FACTS ................................................................................. 5

    A.    South-Central California Coast Steelhead ............................................... 6

    B.    Central California Coast Coho Salmon .................................................... 7

    C.    Tidewater Goby ....................................................................................... 7

    D.    Western Snowy Plover ............................................................................ 7

IV.   STANDARD OF REVIEW ............................................................................... 8

V.    ARGUMENT .................................................................................................... 8

    A.    FEMA Has Violated Its ESA § 7 Consultation ...................................... 8

        1.  Implementation of the NFIP Constitutes Agency Action under ESA Section 7(a)(2) ....... 9

            a. FEMA's NFIP Implementation Indirectly Causes Floodplain Modifications ............. 9

            b. FEMA Has Discretion to Implement the NFIP in a Manner Benefitting Listed Species ........ 12

                i. FEMA Has Discretion Over Implementing Floodplain Management Criteria and Carrying Out the CRS ....... 13

                ii. FEMA Has Discretion to Benefit Species In Its Mapping Activities ....... 14

        2.  Implementation of the NFIP Is Ongoing Agency Action ...................... 15

        3. FEMA's Implementation of the NFIP May Affect ESA Species and Critical Habitat in Santa Cruz County and Monterey County ............... 17

    B.    FEMA Has Failed to Consult as Required Regarding Its Implementation of the Stafford Act Activities in Santa Cruz County and Monterey County ............... 18

C.      FEMA Has Violated Its ESA Section 7 Substantive Duties ......................................20

        1. FEMA Does Not Ensure Its Actions Do Not Harm Species or Result in
           Adverse Modification of Critical Habitat as Required by ESA § 7(a)(2) .............20

        2. FEMA Does Not Act to Conserve Listed Species As Required by
           ESA § 7(a)(1) ...........................................................................................................21

D.      Ecological Rights Foundation Has Standing. ................................................................22

V.   CONCLUSION/RELIEF REQUESTED ..................................................................................24

1

## <u>TABLE OF AUTHORITIES</u>

2   **<u>Cases</u>**

3   *Anderson v. Liberty Lobby, Inc.*,

4        477 U.S. 242 (1986) ............................................................................................................9

5   *Bennett v. Spear*,

6        520 U.S. 154, 176 (1997) .................................................................................................23

7   *Biodiversity Legal Foundation v. Badgley*,

8        309 F.3d 1166 (9th Cir. 2002) ..........................................................................................23

9   *British Airways Bd. v. Boeing Co.*,

10        585 F.2d 946 (9th Cir. 1978) ..............................................................................................9

11   *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,

12        575 F.3d 999 (2009) ....................................................................................................18, 19

13   *Cantrell v. City of Long Beach*,

14        241 F.3d 674 (9th Cir. 2001) ............................................................................................23

15   *Carson-Truckee Water Conservancy Dist. v. Clark*,

16        741 F.2d 257 (9th Cir. 1984) ......................................................................................21, 22

17   *CBD v. U.S. Forest Service*,

18        829 F. Supp. 2d 1029 (D. Az. 2011).................................................................................25

19   *City of Sausalito v. O'Neill*,

20        386 F.3d 1186 (9th Cir. 2004) ..........................................................................................23

21   *Coal. for Sustainable Delta v. Fed. Emergency Mgmt. Agency*,

22        812 F.Supp.2d 1089 (E.D. Cal. 2011) ....................................................11, 14, 16, 17, 18

23   *Conner v. Burford*,

24        848 F.2d 1441 (9th Cir. 1988) ..........................................................................................19

25   *Cottonwood Envtl. Law Ctr. v. U.S. Forest Service*,

26        789 F.3d 1075 (9th Cir. 2015) ....................................................................................17, 25

27   *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt*,

28        698 F.3d 1101 (9th Cir. 2012) ..........................................................................................20

*Defenders of Wildlife v. Martin*,

    No. 05-248, 2007 U.S. Dist. LEXIS 13061 (E.D. Wash. Feb. 26, 2007)................................25

*Defs. of Wildlife v. United States EPA*,

    420 F.3d 946 (9th Cir. 2005) .........................................................................................11, 12

*Ecological Rights Found. v. Pac. Lumber Co.*,

    230 F.3d 114 (9th Cir. 2000) ................................................................................................22

*Florida Key Deer v. Paulison*,

    522 F.3d 1133 (11th Cir. 2008) .................................................................................11, 15, 21

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*,

    528 U.S. 167 (2000) ......................................................................................................22, 23

*Greenpeace v. NMFS*,

    80 F. Supp. 2d 1137 (W.D. Wash. 2000) .............................................................................10

*Hunt v. Washington State Apple Advertising Comm'n*,

    432 U.S. 333 (1977) ..............................................................................................................23

*In re Walmsley*,

    2013 Bankr. LEXIS 4028 (Bankr. D. Or. 2013).....................................................................9

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,

    681 F.3d 1006 (9th Cir. 2012) ..............................................................................................18

*Lujan v. Defenders of Wildlife*,

    504 U.S. 555 (1992) ......................................................................................................22, 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

    475 U.S. 574 (1986) ................................................................................................................9

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,

    551 U.S. 644 (2005) ..............................................................................................................12

*Nat'l Wildlife Fed'n v. Brownlee*,

    402 F. Supp. 2d 1 (D.D.C. 2005)..........................................................................................10

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,

    422 F.3d 782 (9th Cir. 2005) ................................................................................................24

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,

    524 F.3d 917 (9th Cir. 2008) ("*NWF*") ................................................................ 14, 15

*Natural Res. Def. Council v. Houston*,

    146 F.3d 1118 (9th Cir. 1998) ................................................................................... 25

*Nishimoto v. Federman-Bachrach & Assocs.*,

    903 F.2d 709 (9th Cir. 1990) ...................................................................................... 9

*NRDC v. Jewell*,

    749 F.3d 776 (9th Cir. 2014) ..................................................................................... 18

*N.R.D.C. v. Rodgers*,

    381 F. Supp. 2d 1212 (E.D. Cal. 2005) .................................................................... 10

*NWF v. FEMA*,

    345 F.Supp.2d (W.D. Wash. 2004) ......................................................... 11, 14, 16, 18

*NWF v. NMFS*,

    No. 01-00640, 2015 U.S. Dist. LEXIS 11633 (D. Or. Feb. 2, 2015) ....................... 10

*Pacific Northwest Generating Cooperative v. Brown*,

    38 F.3d 1058 (9th 1994) ............................................................................................ 23

*Pacific Rivers Council v. Thomas*,

    30 F.3d 1050 (9th Cir. 1994) ..................................................................................... 17

*Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy*,

    898 F.2d 1410 (9th Cir. 1990) .............................................................................. 20, 21

*Resources Ltd, Inc. v. Robertson*,

    35 F.3d 1300 (9th Cir. 1994) ..................................................................................... 20

*Salmon Spawning & Recovery Alliance v. Gutierrez*,

    545 F.3d 1220 (9th Cir. 2008) ................................................................................... 23

*San Luis & Delta-Mendota Water Authority v. Jewell*,

    747 F.3d 581 (9th Cir. 2014) ..................................................................................... 15

*San Luis & Delta-Mendota Water Auth. v. Locke*,

    776 F.3d 971 (9th Cir. 2014) ..................................................................................... 10

*Sierra Club v. Glickman,*

    156 F.3d 606 (5th Cir. 1998) ........................................................................................21

*Sierra Club v. Marsh,*

    816 F.2d 1376 (9th Cir. 1987) ..............................................................................13, 25

*Sierra Club v. Yeutter,*

    926 F. 2d 429 (5th Cir. 1991) ......................................................................................25

*SYRCL v. NMFS,*

    No. 06-2845, 2011 U.S. Dist. LEXIS 49164 (E.D. Cal. April 28, 2011) ...............................24

*SYRCL v. NMFS,*

    804 F. Supp. 2d 1045 (E.D. Cal. 2011) .........................................................................25

*Turner Broadcasting Sys. v. Fed. Communications Commission,*

    520 U.S. 180 (1997) ...................................................................................................11

*Turtle Island Restoration Network v. NMFS,*

    340 F.3d 969 (9th Cir. 2003) .......................................................................................17

*TVA v. Hill,*

    437 U.S. 153 (1978) .....................................................................................................3

*Village of False Pass v. Watt,*

    565 F. Supp. 1123 (D. Alaska 1983) .............................................................................25

*Wash. Toxics Coal. v. EPA,*

    413 F.3d 1024 (9th Cir. 2005) ...............................................................................17, 18

**Statutes**

16 U.S.C. § 1531(b) ..............................................................................................................3

16 U.S.C. § 1532(3) ............................................................................................................20

16 U.S.C. § 1532(19) ............................................................................................................3

16 U.S.C. § 1533 (c)(2) .........................................................................................................8

16 U.S.C. § 1536(a)(1) ....................................................................................................3, 20

16 U.S.C. § 1536(a)(2) ......................................................................................................2, 3

16 U.S.C. § 1536(b)(3) ..........................................................................................................3

16 U.S.C. § 1536(b)(3)(A)................................................................................................4

16 U.S.C. § 1536(b)(4) .....................................................................................................4

16 U.S.C. § 1536(c) ..........................................................................................................3

16 U.S.C. §§ 1538(a)(1)(B) ..............................................................................................3

42 U.S.C. § 4001 ........................................................................................................4, 11

42 U.S.C. § 4001(c)(1) ...................................................................................................11

42 U.S.C. § 4001(e) ........................................................................................................11

42 U.S.C. § 4002(a)(2) ...................................................................................................11

42 U.S.C. § 4012a .............................................................................................................6

42 U.S.C. § 4012(c) ........................................................................................................15

42 U.S.C. § 4012(c)(2) .....................................................................................................4

42 U.S.C. § 4022(b) ..........................................................................................................5

42 U.S.C. § 4022(b)(1) ...................................................................................................15

42 U.S.C. § 4022(b)(2) ...................................................................................................16

42 U.S.C. § 4101 ...............................................................................................................5

42 U.S.C. § 4101(a) ........................................................................................................16

42 U.S.C. § 4101(b) ........................................................................................................16

42 U.S.C. § 4101(e) ....................................................................................................5, 16

42 U.S.C. § 4101(f) .........................................................................................................16

42 U.S.C. § 4102 ...............................................................................................................4

42 U.S.C. § 4102(a) ........................................................................................................16

42 U.S.C. § 4102(c) ..........................................................................................................4

42 U.S.C. 4102(c)(2) ......................................................................................................14

42 U.S.C. 4102(c)(4) ......................................................................................................14

42 U.S.C. § 4106 ...............................................................................................................6

42 U.S.C. § 4202 ...............................................................................................................6

42 U.S.C. § 5121 et seq. ..................................................................................................18

**Administrative Regulations**

40 C.F.R. § 402.02 ................................................................................................... 3

40 C.F.R. § 402.03 ................................................................................................... 3

44 C.F.R. § 59.1 ................................................................................................... 5, 6

44 C.F.R. § 59.2(a) ............................................................................................ 4, 11

44 C.F.R. § 59.22 .................................................................................................... 4

44 C.F.R. § 59.24 ............................................................................................... 5, 18

44 C.F.R. § 60.3 ...................................................................................................... 4

44 C.F.R. § 60.7 ............................................................................................... 15, 18

44 C.F.R. § 64.3 ...................................................................................................... 5

44 C.F.R. § 65.5 ...................................................................................................... 5

44 C.F.R. § 65.6 ...................................................................................................... 5

44 C.F.R. pt. 72 ....................................................................................................... 5

44 C.F.R. § 72.2 ................................................................................................... 5, 6

50 C.F.R. § 223.203 ................................................................................................ 3

50 C.F.R. § 402.01(b) ............................................................................................. 3

50 C.F.R. § 402.02 ............................................................................. 3, 10, 14, 21

50 C.F.R. § 402.03 ................................................................................................ 14

50 C.F.R. § 402.12 .................................................................................................. 3

50 C.F.R. § 402.13 .................................................................................................. 3

50 C.F.R. § 402.14 .................................................................................................. 3

**Other Authorities**

51 Fed. Reg. 19,926, 19,949 (June 3, 1996) ....................................................... 18

55 Fed. Reg. 28,291 ............................................................................................... 5

58 Fed. Reg. 12,864 (Mar. 5, 1993) ...................................................................... 9

58 Fed. Reg. 12,870 (March 5, 1993) .................................................................... 9

59 Fed. Reg. 5494 (Feb. 4, 1994) .......................................................................... 8

59 Fed. Reg. 5495 .................................................................................................. 8

59 Fed. Reg. 5496 .................................................................................................. 8

70 Fed. Reg. 37160, 37204 (June 28, 2005) ......................................................................8

70 Fed. Reg. 52488 ...........................................................................................................7

70 Fed. Reg. 52522 ...........................................................................................................7

71 Fed. Reg. 856 ...............................................................................................................7

71 Fed. Reg. 848 ...............................................................................................................7

77 Fed. Reg. 36727, 36765-66 (June 19, 2012) ..............................................................9

78 Fed. Reg. 8745, 8750 (Feb. 6, 2013) ..........................................................................8

79 Fed. Reg. 20802, 20816 (April 14, 2014) ...................................................................8

82 Fed. Reg. 12,627, 12,628 (Mar. 6, 2017) .................................................................17

85 Fed. Reg. 7557 (Feb. 12, 2016) .................................................................................17

Fed. R. Civ. P. 56(a) .........................................................................................................9

Fed. R. Civ. P. 56(c)(2) .....................................................................................................9

**NOTICE OF MOTION AND MOTION**

For the reasons stated herein, Plaintiff Ecological Rights Foundation moves for summary judgment that Defendant Federal Emergency Management Agency ("Defendant" or "FEMA") violated the Endangered Species Act ("ESA") by failing to consult as required by ESA § 7(a)(2), by failing to ensure its actions do not jeopardize the survival and recovery of endangered and threatened species as required by ESA § 7(a)(2), and by failing to carry out programs for the "conservation" of the listed species. Fed. R. Civ. Proc. 56; 16 U.S.C. § 1531 *et seq*. The hearing time and date will be set following completion of the briefing. Dkt. No 27.

**RELIEF REQUESTED**

Plaintiff requests declaratory relief that FEMA failed to consult as required, failed to ensure species' survival and recovery is not jeopardized, and failed to act to conserve species. Plaintiff also and injunctive relief to enjoin FEMA from taking further discretionary actions pursuant to the National Flood Insurance Program or the Stafford Act in Santa Cruz and Monterey counties that may adversely affect and cause irreparable harm to listed species until it has completed the required ESA § 7 consultation.

**I.     INTRODUCTION AND STATEMENT OF ISSUES**

The Federal Emergency Management Agency ("FEMA")'s ongoing implementation of the National Flood Insurance Program ("NFIP") and Stafford Act programs in Santa Cruz and Monterey counties adversely impacts endangered and threatened species protected under the Endangered Species Act ("ESA"). ESA § 7(a)(2) requires FEMA to consult with the National Marine Fisheries Service ("NMFS") and the U.S. Fish and Wildlife Service ("FWS") (collectively the "Services") before taking any action which "may affect" any ESA-listed species or their critical habitat. 16 U.S.C. § 1536(a)(2). ESA § 7(a)(2) further imposes a substantive duty on FEMA to ensure that the NFIP does not jeopardize the survival or recovery of ESA-listed species. Additionally, ESA § 7(a)(1) obligates FEMA to utilize its authority to advance conservation of ESA-listed species. FEMA is violating the ESA by implementing the NFIP and Stafford Act programs in Santa Cruz and Monterey counties without consulting with the Services, by failing to take measures to ensure that its NFIP and Stafford Act implementation does not jeopardize ESA-listed species' survival and recovery, and by failing to act to conserve ESA-listed

species in the way it implements the NFIP and Stafford Act in Santa Cruz and Monterey counties.

FEMA refuses to engage in the required ESA § 7 consultation here despite several court rulings that implementation of the NFIP is an action that "may affect" listed species, and despite agreeing to undertake consultation to settle several suits in California, Washington, Oregon and New Mexico. Moreover, NMFS and the FWS have repeatedly urged FEMA to engage in consultation regarding the NFIP, yet FEMA refuses to do so. Moreover, FEMA continues to refuse to implement endangered species protective measures called for by the Services that FEMA should implement to comply with its substantive ESA § 7 duties to avoid jeopardizing and to conserve ESA-listed species.

Accordingly, Plaintiff Ecological Rights Foundation ("EcoRights") is entitled to summary judgment granting declaratory relief on its Claims 1-6 that FEMA is violating the ESA. EcoRights should further be granted injunctive relief requiring FEMA to comply with the ESA and halt actions to implement the NFIP and/or Stafford Act in Monterey and Santa Cruz counties that violate the ESA.

## II.    STATUTORY AND REGULATORY BACKGROUND

### A.    Endangered Species Act

Congress enacted the ESA "to halt and reverse the trend toward species extinction, whatever the cost." *TVA v. Hill*, 437 U.S. 153, 184 (1978). The ESA provides "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and to provide a program for the conservation of such species. 16 U.S.C. § 1531(b). ESA § 7(a)(2), *inter alia*, requires federal agencies to ensure that their actions are not likely to jeopardize the survival of a protected species or cause destruction or adverse modification of a species' designated critical habitat. 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.02. In addition, ESA § 7(a)(1) obligates Federal agencies to "utilize their authorities in furtherance of the [ESA] purposes …by carrying out programs for the conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1). To comply with these mandates, federal agencies must consult with the Services before undertaking any discretionary action which is likely to result in adverse effects to ESA-listed species, or which will destroy or adversely modifying such species' critical habitat, using the best scientific data available. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.01(b), 223.203. Actions subject to these consultation duties include activities or programs "of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," (40 C.F.R. §

402.02), "in which there is discretionary Federal involvement or control" (40 C.F.R. § 402.03). To assist this consultation, action agencies must provide the Services with a biological assessment or evaluation outlining the action and the effects of that action on the species. 16 U.S.C. § 1536(c); 50 C.F.R. § 402.12. For actions that are not likely to adversely affect listed species, the action agency and the Services can conduct "informal consultation," which concludes with a written concurrence letter from the Services that the action is unlikely to have adverse impacts. 50 C.F.R. § 402.13. For actions that are likely to have adverse impacts, formal consultation is required, which concludes when the Services issue a "biological opinion" indicating whether the action will cause species jeopardy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3); 50 C.F.R. § 402.14. If the Services so find, they will identify any "reasonable and prudent alternatives" ("RPAs") that they conclude would avoid such species jeopardy or adverse habitat modification. 16 U.S.C. § 1536(b)(3)(A). If the RPAs will "take" a listed species, but not jeopardize species or their habitat's, then the Services may issue an Incidental Take Statement ("ITS") allowing that "take" providing certain conditions are met. 16 U.S.C. § 1536(b)(4).

### B.   National Flood Insurance Act and the National Flood Insurance Program

FEMA implements the NFIP pursuant to the National Flood Insurance Act ("NFIA"). 42 U.S.C. §§ 4001, *et seq*. The NFIP is a federal program that enables private property owners to purchase federal flood insurance. 42 U.S.C. § 4001; *see also* 44 C.F.R. § 59.2(a). The NFIP provides an insurance alternative to disaster assistance to meet the costs of repairing flood damage. The NFIP is typically the only means for private property owners to secure flood insurance for properties in flood prone areas as private flood insurance is generally unavailable in such areas. 44 C.F.R. § 59.2(a). Local communities become eligible for federal flood insurance once they have adopted "adequate land use and control measures" consistent with criteria developed by FEMA pursuant to NFIA authority. 42 U.S.C. §§ 4012(c)(2), 4102; 44 C.F.R. § 59.22. FEMA has adopted regulations establishing "comprehensive criteria" (44 C.F.R. § 60.3) for encouraging the adoption of local land use measures that reduce development exposed to floods and flood damage and "otherwise improve the long range land management and use of flood-prone areas." 42 U.S.C. § 4102(c).

Although the NFIA authorizes FEMA to adopt regulations to generally protect the floodplain, FEMA's existing regulations are primarily designed to minimize flood damage to structures and water

systems, and to avoid exacerbating floods by increasing flood levels. Hunt Decl., Ex. P at 2 (FEMA, National Flood Insurance Program: Program Description). The regulations are not designed or intended to protect aquatic habitat, imperiled species, or other environmental values.

FEMA oversees communities' participation in and eligibility for the NFIP in an ongoing manner. Answer, ¶ 21. "FEMA monitors communities to ensure that they have adopted an ordinance that meets or exceeds the minimum NFIP floodplain management criteria and to ensure that they are effectively enforcing their ordinance." Answer, ¶ 21. FEMA conducts community visits and contacts to ensure proper implementation of NFIP requirements. Answer, ¶ 21. A community's failure to implement and enforce NFIP minimums can result in probation or suspension from the program, which would make federal flood insurance unavailable in that community. 44 C.F.R. § 59.24.

FEMA also implements a Community Rating System ("CRS"), a separate, voluntary program to encourage local floodplain management regulation that exceeds the regulatory minimums. 42 U.S.C. § 4022(b). Under the CRS, floodplain management regulation above NFIP minimums is rewarded with lower insurance rates. *See* 55 Fed. Reg. 28,291 (July 10, 1990); Hunt Decl.,Ex. P at 32 (Program Description) (goal of CRS is to "protect natural and beneficial floodplain functions").

FEMA further implements the NFIP through development and revision of Flood Insurance Rate Maps ("FIRM") and other information that identify and categorize flood-prone areas. 42 U.S.C. § 4101. *See* 44 C.F.R. § 64.3. The NFIA requires FEMA to review its FIRMs at least once every five years to assess new information. 42 U.S.C. § 4101(e). FIRMs must map special flood hazard areas ("SFHAs"), *i.e.*, "the land in the flood plain within a community subject to a 1 percent or greater chance of flooding in any given year." 44 C.F.R. § 59.1. Development of properties within the SFHA must comply with floodplain regulations established by FEMA.

FEMA also revises its FIRMs based on man-made alterations to the floodplain, such as the placement of fill. *See, e.g.,* 44 C.F.R. §§ 65.5, 65.6; 44 C.F.R., Part 72. If FEMA revises a FIRM to remove a property from the floodplain, development on that property becomes exempt from FEMA's floodplain management regulations. FEMA-BE-0027706. FEMA can issue different types of Letters of Map Change ("LOMCs"), including, but not limited to, a Conditional Letter of Map Revision ("CLOMR"), a Conditional Letter of Map Revision Based on Fill ("CLOMR-F"), a Letter of Map

1    Revision ("LOMR"), and a Letter of Map Revision Based on Fill ("LOMR-F"). 44 C.F.R. § 72.2.[1]

2    Community participation in the NFIP is technically voluntary. FEMA-BE-0027678. Failure to

3    enroll in the NFIP can, however, have dire consequences for properties in the floodplain. *See* FEMA-

4    BE-0027706. For example, the NFIA prohibits federally insured or regulated banks and the Veterans

5    Administration from making mortgage loans for buildings in the 100-year floodplain that lack flood

6    insurance. 42 U.S.C. § 4012a. The Act also prohibits the Federal Housing Administration and the Small

7    Business Administration from making or guaranteeing a loan secured by a building in a floodplain that

8    lacks flood insurance. *Id*. Federal flood insurance cannot be purchased in non-participating

9    communities. *Id*. §§ 4202, 4106. Accordingly, local participation in the NFIP is almost universal.

10    **III.    STATEMENT OF FACTS**

11    As shown by the applicable FIRMs, the Santa Cruz and Monterey counties' floodplains

12    encompass ocean fronting beaches and near-shore dunes, tidal waters such as lagoons and estuaries and

13    adjoining shorelines, rivers and streams and adjoining riparian corridors in areas subject to flooding

14    from overflowing rivers and streams. Development in these floodplains is widespread. Many of the

15    lagoons and estuaries in Santa Cruz and Monterey counties are surrounded by encroaching development.

16    Hunt Decl. Ex. O at 9-9, 9-10, 9-11, 10-8 (2013 SCCC Steelhead Recovery Plan); Hunt Decl. Ex. K at

17    C-14 to C-17 (Tidewater Goby Recovery Plan). The counties' riparian corridors are extensively

18    developed with housing, industrial parks, and commercial developments. Hunt Decl. Ex. O at 4-5, 9-16,

19    10-8, 10-10 (2013 SCCC Steelhead Recovery Plan); Hunt Decl. Ex. K at C-14 to C-17 (Tidewater Goby

20    Recovery Plan). For example, the San Lorenzo River's lower reaches are paved over with streets and

21    levees built along the river's banks constrict the river from meandering across the historic floodplain.

---

23  [1] A LOMR is "generally based on the implementation of physical measures that affect the hydrologic or

24  hydraulic characteristics of a flooding source and thus result in the modification of the existing regulatory floodway,[1] the effective base flood elevations, or the SFHA." 44 C.F.R. § 72.2. A LOMR-F

25  "is FEMA's modification of the SFHA shown on the FIRM based on the placement of fill outside the existing regulatory floodway." 44 C.F.R. § 72.2. A CLOMR "is FEMA's comment on a proposed

26  project that would, upon construction, affect the hydrologic or hydraulic characteristics of a flooding source and thus result in the modification of the existing regulatory floodway, the effective base flood

27  elevations, or the [SFHA]." *Id*. A CLOMR-F "is FEMA's comment on a proposed project that would, upon construction, result in a modification of the SFHA through the placement of fill outside the

28  existing regulatory floodway." *Id.*

1   Hunt Decl. Ex. N at 18 (Coho 5-Year Review); Hunt Decl. Ex. K at C-14 (Tidewater Goby Recovery

2   Plan). Development has brought artificial lighting, roads, and noise to the counties' beaches and dunes.

3   Hunt Decl. Ex. F at 33-35 (Western Snowy Plover Recovery Plan).

4       The NFIP facilitates this development by providing flood insurance for property that would

5   otherwise be uninsurable--causing great harm to critical habitat for various ESA-listed species.

6   Recognizing the harm to ESA-listed species done by FEMA's implementation of the NFIP, the Services

7   or courts have for over 20 years urged FEMA to engage in ESA § 7 consultation regarding NFIP effects

8   on endangered and threatened species. *See* Hunt Decl. Ex. G at Enclosure page 1 (NMFS

9   correspondence stating "FEMA has been told by several judges that the National Flood Insurance

10  Program (NFIP) is a Federal action subject to ESA section 7 requirements.)" Nonetheless, FEMA has

11  continued to implement the NFIP in Monterey and Santa Cruz counties without such consultation.

12      There are 12 listed species with designated critical habitat overlapping SFHAs in Monterey and

13  Santa Cruz counties. This motion focuses on the NFIP's impacts to four of these species to illustrate that

14  the NFIP "may affect" ESA-listed species: South-Central California Coast Steelhead ("SCCC

15  Steelhead"), Central California Coast coho salmon ("CCC Coho"), tidewater goby, and western snowy

16  plover ("WSP").

17      **A.      South-Central California Coast Steelhead**

18      NMFS has listed SCCC Steelhead, which inhabits both Santa Cruz and Monterey counties, as a

19  threatened species. 71 Fed. Reg. 848 (Aug. 14, 2006). NMFS found urban development to be one of the

20  key factors causing SCCC Steelhead decline and impairment of its critical habitat. *Id.* at 856; 70 Fed.

21  Reg. 52,488, 52,522 (Sept. 2, 2005). Much of the designated SCCC Steelhead critical habitat in

22  Monterey and Santa Cruz counties is being degraded by floodplain development. For example, NMFS's

23  official SCCC Steelhead Recovery Plan adopted pursuant to its ESA duties identifies watershed

24  developments as degrading SCCC Steelhead habitat in reaches of the Carmel and Pajaro Rivers and their

25  tributaries, impeding Steelhead spawning and rearing. Hunt Decl. Ex. O at 10-10, 4-5 & 9-12 (2013

26  SCCC Steelhead Recovery Plan). Moreover, NMFS's SCCC Steelhead Recovery Plan expressly

27  identifies deficiencies in the NFIP as negatively impacting SCCC Steelhead. *Id.* at 3-6; *see also* Hunt

28  Decl. Ex. E at 38 (2016 5-Year Review of SCCC Steelhead).

**B.      Central California Coast Coho Salmon**

NMFS has listed CCC Coho, which inhabits both Santa Cruz and Monterey counties, as an endangered species. 70 Fed. Reg. 37,160, 37,204 (June 28, 2005); 79 Fed. Reg. 20,802, 20,816 (April 14, 2014); *see also* Hunt Dec. Ex. M at 1 and 3. NMFS's official five-year review of CCC Coho's status identified urban development, including development adjoining the San Lorenzo River in Santa Cruz County, as a factor degrading CCC Coho critical habitat. 2016 5-Year Review at 18. NMFS identified the various adverse impacts of urban development in CCC Coho habitat, including direct destruction of habitat, including wetland and estuarine/lagoon habitat, more rapid runoff during rains/intense flood flows, alterations of the hydraulic/geomorphic processes that create and maintain complex instream habitat, and pollution/degradation of water quality. *Id.*

**C.      Tidewater Goby**

The tidewater goby is a small endangered fish residing in low salinity waters in California's coastal wetlands, including those in Santa Cruz and Monterey counties. 59 Fed. Reg. 5,494 (Feb. 4, 1994). FWS has identified coastal development projects that result in the loss of coastal wetland and lagoon habitat as the major factor adversely affecting tidewater goby. *Id.* at 5495; *see also*, 78 Fed. Reg. 8745, 8750 (Feb. 6, 2013); Hunt Decl. Ex. K at 16 (Tidewater Goby Recovery Plan). FWS has identified coastal residential and industrial developments, road construction projects, waterway draining and dredging, water diversions, and river channelization as causing permanent and direct losses of tidewater goby wetland habitats, as well as indirect habitat harm due to associated changes in salinity in the coastal wetlands/lagoons tidewater goby inhabit. 59 Fed. Reg. at 5495-96. FWS has also identified polluted storm water runoff from developed areas adjoining tidewater goby habitat as a factor in the species decline. Hunt Decl. Ex. K at 21 (Tidewater Goby Recovery Plan).

**D.      Western Snowy Plover**

The WSP is a threatened species. 58 Fed. Reg. 12,864 (Mar. 5, 1993). WSP habitat includes coastal beaches, beaches at river/creek mouths, and estuaries located in Santa Cruz and Monterey counties. *Id.*; 77 Fed. Reg. 36,727, 36,764-66 (June 19, 2012). FWS has designated four critical habitat units for the WSP in Monterey County and four such units in Santa Cruz County, all of which are important WSP breeding areas and all of which are located within the FEMA designated floodplain. 77

Fed. Reg. 36,727, 36,764-66; Hunt Decl. ¶¶ 31-32 and Exs. HH and II. FWS found that development

threatens WSP in these critical habitat units by creating artificial lighting, elevated sound and vibration

levels, pollutant drift, and introduction of domestic WSP predators. 58 Fed. Reg. at 12,870 (Mar. 5,

1993); 77 Fed. Reg. 36765-66; Hunt Decl., Ex. F (WSP Recovery Plan, at 34).

## IV.    STANDARD OF REVIEW

Where "there is no genuine issue as to any material fact . . . the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(c)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp*.,

475 U.S. 574, 586-87 (1986). A court may resolve all claims on summary judgment, liability on only

portion of claims, or discrete factual or legal issues (without resolving liability). Fed. R. Civ. P. 56(a),

(g); *see, e.g., In re Walmsley,* 2013 Bankr. LEXIS 4028, at *35 (Bankr. D. Or. 2013). FEMA must do

more than show "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see*

*also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986). It must affirmatively introduce evidence

controverting EcoRights' factual showing (*Liberty Lobby*, 477 U.S. at 248-52), and thereby show a

"genuine issue for trial" (*Matsushita*, 475 U.S. at 587).

## V.    ARGUMENT

### A.    FEMA Has Violated Its ESA § 7 Consultation Duty.

FEMA implements two components of the NFIP, flood hazard mapping activities and floodplain

management activities, in Santa Cruz and Monterey counties that "may affect" listed species and yet it

has failed to consult with the Services regarding the NFIP in violation of ESA § 7(a)(2). There is no

genuine dispute that FEMA's floodplain mapping and floodplain management activities are "agency

action." They are (a) programs carried out by FEMA that directly or indirectly cause modifications to

the floodplains that (b) FEMA has discretion to implement in a manner that could benefit ESA-listed

species. FEMA's implementation of the NFIP may affect listed species, including CCC Coho, SCCC

Steelhead, tidewater goby, and WSP.

FEMA's Answer's assertion that its Biological Evaluation ("BE")'s "no effect" determination

absolves FEMA of an ESA § 7 consultation duty over the NFIP is wrong. *See* Dkt. 23, ¶ 139. As argued

in the companion case, *EcoRights v. FEMA*, Civ. No. 17-02788-JD (N.D. Cal.), the BE's conclusions are

factually erroneous and contrary to law. FEMA's implementation of the NFIP is an ongoing "agency

action," FEMA has discretion to ensure benefit to listed species when implementing the NFIP, and the impact of the NFIP implementation, which includes both constraining and encouraging floodplain development, "may affect" listed species. These factors mandate ESA § 7 consultation.

Whether ongoing implementation of the NFIP constitutes an "agency action" under the ESA is a legal rather than factual question. As such, the Court owes no deference to FEMA's interpretations of this legal question. *See N.R.D.C. v. Rodgers,* 381 F. Supp. 2d 1212, 1240 (E.D. Cal. 2005); *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 11 (D.D.C. 2005); *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1146 (W.D. Wash. 2000). However, even in cases where scientific conclusions are at issue, the Court must engage in a "probing" review and not "automatically" conclude that the agency's decision was not arbitrary or capricious. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994-95 (9th Cir. 2014); *NWF v. NMFS*, No. 01-00640, 2015 U.S. Dist. LEXIS 11633, at *14 (D. Or. Feb. 2, 2015).

1.     **Implementation of the NFIP Constitutes Agency Action under ESA § 7(a)(2)**

a.  **FEMA's NFIP Implementation Indirectly Causes Floodplain Modifications.**

"Agency action" for ESA purposes encompasses "all activities or programs of any kind authorized, funded, or carried out, in whole or in part" by the agency that directly or indirectly causes modifications to the land, water, or air. 50 C.F.R. § 402.02. FEMA's NFIP implementation is a FEMA program that directly or indirectly causes floodplain modifications by both constraining and incentivizing floodplain development.

*First*, Congress created the NFIP expressly to affect how and where floodplains were developed. 42 U.S.C. § 4001(c)(1) (NFIP is to "encourag[e] sound land use by minimizing exposure of property to flood losses"). Congress found the "availability of Federal … insurance… [is] often [a] determining factor in the utilization of land and the location and construction of public and of private industrial, commercial, and residential facilities." 42 U.S.C. § 4002(a)(2). Congress intended the NFIP to influence floodplain development in a manner that would reduce the nation's flood exposure. 42 U.S.C. § 4001(e). The NFIA does not require development occur outside the floodplain, rather it is directed at ensuring development in flood-prone areas is protected against flood risks. *See* 42 U.S.C. § 4001; 44 C.F.R. § 59.2(a). The language of the NFIA makes clear that implementation of the NFIP indirectly causes modifications to land and water in the floodplain. Congressional findings and Congress's predictive

judgments are to be accorded substantial deference. *Turner Broadcasting Sys. v. Fed. Communications Commission*, 520 U.S. 180, 195-96 (1997). Thus, the Court should find that as Congress intended, the NFIP influences floodplain development.

**Second**, every court faced with the issue has determined that implementation of the NFIP is "agency action." This is because the NFIP plainly involves "actions that indirectly cause modifications to the land and water (e.g., FEMA's mapping of floodplains) determines the applicability of local land use regulations, and FEMA's CRS provides incentives to modify the floodplains in certain ways." *NWF v. FEMA*, 345 F. Supp. 2d 1151, 1169 (W.D. Wash. 2004). Further, "[b]y allowing individuals to remove their property from regulation by artificially filling it [using the LOMR and LOMR-f process], FEMA is in effect encouraging filling." *Id.* at 1164; *see also Coal. for Sustainable Delta v. Fed. Emergency Mgmt. Agency ("CSD")*, 812 F. Supp. 2d 1089, 1132 (E.D. Cal. 2011) (denying FEMA's argument that floodplain mapping activities pursuant to the NFIP have "no effect," and finding mapping actions "collectively has the potential to encourage third parties to fill and/or build levees in the Delta floodplain"); *Fla. Key Deer v. Paulson*, 522 F.3d 1133, 1142-44 (11th Cir. 2008) (rejecting FEMA's argument that the NFIP is not a legally relevant cause of floodplain development).

**Third**, FEMA's administrative record demonstrates that the NFIP is among the factors that cause floodplain development. FEMA cannot claim that because other factors may also contribute to how and where floodplain development occurs that the NFIP's effect on development does not support a finding of "agency action" in this case. *See Defs. of Wildlife v. United States EPA*, 420 F.3d 946, 961-62 (9th Cir. 2005) *overruled on other grounds by Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2005) ("agency action" includes actions that are among others that ultimately combine to cause development). The evidence demonstrating that the NFIP induces, at least in part, the development of floodplains includes the following reports that FEMA has expressly included in its administrative record: (1) American Institutes for Research, 2006 ("AIR Report"); (2) Bagstad K., *et al*, 2007; and (3) Congressional Research Service, 2013.

The AIR Report specifically found that provision of federally-subsidized flood insurance creates an incentive for development in floodplains by reducing barriers to such development. FEMA-BE-0023359. While the report acknowledged that the NFIP's influence is "nuanced," the report states that

the NFIP has "**direct and indirect impacts on the amount of development that occurs in floodplains.**" *Id*. The AIR Report found the NFIP has both the effect of discouraging development in floodplains and encouraging floodplain development by "act[ing] to remove barriers to that development." *Id*. In addition, the authors of the AIR Report conducted a nationwide survey of property developers, insurers, lenders, realtors, and floodplain administrators, which found:

- Flood insurance was identified among the most important factors affecting decisions to either purchase or develop property in the community;
- More than three-quarters of the respondents identified flood insurance as "very important" to decisions regarding where they would develop or purchase property in their community;
- Almost eighty percent of the respondents with potential investments in community property development stated that they would not finance or develop floodplain property if federal flood insurance were unavailable.

FEMA-BE-0023359. FEMA's BE argument that the NFIP does not cause floodplain development ignores this evidence altogether, and instead focuses on the AIR Report's more narrow analysis of coastal barrier development. The AIR Report found that some coastal barrier areas still developed despite the prohibition of NFIP flood insurance availability, but FEMA *ignores* the report's extensive caveats concerning drawing any conclusions about whether the NFIP in fact influenced coastal barrier development. FEMA-BE-0023359. Overall, the AIR Report demonstrates that the NFIP does affect, and at least in part encourages, floodplain development.

The Bagstad study further demonstrates that the NFIP indirectly causes development in floodplains. For instance, the Bagstad study concluded that the NFIP "allows landholders to develop areas that the market alone might otherwise deem too risky for construction," and as such "encouraged risky development." FEMA-BE-0024141.

In addition, the Congressional Research Service, 2013 report, which FEMA relies on in the BE for the proposition that very few homes actually obtain NFIP insurance, in fact contains significant discussion which finds NFIP participation rates to be closer to 50 percent. FEMA-BE-0023528-29 (referring to an extensive 2006 FEMA-commissioned Rand Corporation study, which specifically focused on the NFIP's market penetration rate). In sum, findings from the Congressional Research Service, 2013 report suggests that the NFIP indirectly enables floodplain development by providing a

mechanism for property owners to insure otherwise risky development.

*Fourth*, the Services assert that the NFIP is an "agency action" for purposes of ESA § 7(a)(2). The Services determination of whether FEMA's implementation of the NFIP qualifies as "agency action" is entitled to deference, as the Services were responsible for drafting the regulations that define "agency action." *See Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987). For example, in 2012, NMFS concluded that FEMA's floodplain criteria "promote construction in floodplain rather than discourage development in floodplains, to the detriment of ESA-listed species and their critical habitat." Hunt Decl. Ex. J at 3; *see also,* Hunt Decl. Ex. H at 3 (concluding that implementation of the NFIP in the Sacramento San Joaquin River Delta is "an 'action' warranting formal ESA consultation"). FWS similarly concluded "the manner in which the NFIP provides or does not provide insurance against flood damages influences the type and amount of development in floodplains." Hunt Decl. Ex. L at 1.

NMFS's Biological Opinion evaluating the NFIP's effects in Puget Sound concluded that the NFIP prompts floodplain development which affects ESA-listed species. FEMA-BE-0031580-81. NMFS's Biological Opinion evaluating the NFIP's effect in Oregon ("Oregon BiOp") found that FEMA's floodplain mapping, setting of regulatory floodplain management criteria, and implementation of the CRS all directly and indirectly lead to floodplain development and modification to floodplain environments detrimental to ESA-listed salmonids. FEMA-BE-0031333-4; FEMA-BE-0031306. Moreover, an independent review of the NFIP concluded the "program encourages . . . the development and environmental transformation of wetlands and coastal areas, or that it does little to impede these impacts." FEMA-BE-0031581.

### b. FEMA Has Discretion to Implement the NFIP in a Manner Benefitting Listed Species.

FEMA's implementation of the NFIP further qualifies as an "agency action" because FEMA has discretion to implement all or portions of the NFIP in a manner that could benefit listed species. *See* 50 C.F.R. §§ 402.02, 402.03; *NWF v. FEMA ("NWF")*, 345 F. Supp. 2d 1151, 1174 (various components of NFIP are discretionary agency actions requiring ESA § 7 consultation); *CSD*, 812 F. Supp. 2d at 1132-33 (same). In a memorandum sent to FEMA regarding the Oregon consultation, NMFS provides lengthy, well-reasoned analysis and concludes that FEMA has both the authority and discretion to implement the NFIP in a manner that protects species. *See* Hunt Decl. Ex. Q at 4-16.

FEMA itself acknowledged its discretion to implement the NFIP to benefit species when it agreed to undertake consultation to settle cases similar to this one brought in Oregon, Florida, New Mexico, and Washington. *CSD*, 812 F.Supp.2d at 1096-97 (noting relevance of settlements in other cases since without discretion FEMA could not lawfully enter the settlements). And in its BE, FEMA acknowledges its discretion concerning NFIP implementation. FEMA-BE-0027660. Among the elements of the NFIP over which FEMA acknowledges it has discretion are: (1) floodplain management (such as implementing floodplain management criteria and administering the CRS), and (2) flood hazard mapping (such as FEMA's decision to publish FIRMs and decision on level of study performed, and issuing CLOMR and CLOMR-f). FEMA-BE-0027660 and 0027663-5.

### i. FEMA Has Discretion Over Implementing Floodplain Management Criteria and Carrying Out the CRS.

FEMA does not dispute it has discretion when implementing the floodplain management criteria or administering the CRS. (FEMA-BE-0027660 and 0027663-5). Notably, the NFIA authorizes FEMA to develop minimum criteria that will "otherwise improve the long-range land management and use of flood-prone areas." 42 U.S.C. §§ 4102(c)(2), (c)(4). This broad language certainly provides FEMA with discretion to develop and implement minimum criteria that will benefit listed species that use flood-prone areas. *See NWF v. FEMA*, 345 F. Supp. 2d at 1173; *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 928-29 (9th Cir. 2008) (an action is only nondiscretionary if a statute directs the agency to take a specific action, which makes it impossible to comply with that statute and ESA § 7); *see also San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 639-40 (9th Cir. 2014). For FEMA to lack discretion, the NFIA must specifically direct FEMA's actions be done in a particular way, but it does not and instead grants FEMA wide discretionary authority that FEMA could use to benefit ESA-listed species. *See Florida Key Deer*, 522 F.3d at 1141-42.

Further, when carrying out the NFIP, FEMA is required to make flood insurance available in communities that have adequate land use and control measures in place, as judged by determining whether the communities' ordinances meet FEMA's minimum criteria. 42 U.S.C. § 4012(c); *see Florida Key Deer*, 522 F.3d at 1142. Accordingly, "FEMA has discretion to consider endangered and threatened

species in its administration of the NFIP. Indeed, this finding is consistent with FEMA's own regulations implementing the NFIP, wherein wildlife and environmental concerns are considered." *Id.* at 1143.

NMFS likewise confirms that FEMA has discretion to benefit species when implementing the NFIP. *See* Hunt Decl. Ex. Q at 6-14  (NMFS explaining FEMA's broad discretion to establish and implement minimum criteria to benefit endangered species); Hnt Decl. Ex. H at 3; FEMA-BE-0031441-0031442 and FEMA-BE-0031454-0031457 (Oregon); FEMA-BE-0031730-0031731 (Puget Sound) (both documents setting forth RPAs, which NMFS asserts FEMA has discretion to implement, including revisions to minimum criteria necessary to avoid jeopardy to certain endangered and threatened species).

FEMA's requirements for floodplain management criteria also specifically provide FEMA with authority to revise them "as experience is acquired under the Program and new information becomes available" and require that communities update their ordinances when FEMA revises the criteria. 44 C.F.R. § 60.7. As such, FEMA's own regulations provide for ongoing involvement in the implementation of the NFIP in a manner that allows FEMA it to exercise discretion to benefit species.

Similarly, FEMA retains discretion to benefit species when carrying out the CRS. Congress authorized FEMA "to carry out a community rating system program, … to provide incentives for measures that reduce the risk of flood or erosion damage [and] to encourage adoption of more effective measures that protect natural and beneficial floodplain functions," among others. 42 U.S.C. § 4022(b)(1). Communities that adopt the measures set out in the CRS program become eligible for discounts on flood insurance premiums. 42 U.S.C. § 4022(b)(2). Accordingly, FEMA's implementation of the CRS not only effects how and where floodplain development occurs, FEMA retains discretion to implement the CRS in a manner that would benefit listed species.

### ii.     FEMA Has Discretion to Benefit Species In Its Mapping Activities

The NFIA grants FEMA discretion over its mapping activities. *See* 42 U.S.C. § 4101(e)-(f). Specifically, FEMA has discretion how to implement its program for mapping flood hazards and adoption of FIRMs; and its program for changing and revising a FIRM with LOMR and CLOMR.

In the BE, FEMA admits it "has some discretion over most of the flood hazard mapping activities." FEMA-BE-0027884. FEMA further explains it "has discretion regarding the level of study performed for the FIRM. The level of study performed is dependent on a number of factors, such as the

level of a community involvement, the level of flood risk, funding, and watershed characteristics."

FEMA-BE-0027884. FEMA could exercise its discretion when developing and adopting a FIRM to

ensure all floodplains are mapped accurately, by determining when revisions are necessary based on its

five-year review of floodplain areas, by reviewing annual reports by the Technical Mapping Advisory

Council, and by carrying out studies with respect to the adequacy of state and local measures in flood

prone areas. *See* 42 U.S.C. §§ 4101(e-f), 4101a, 4101b, 4102(a). NMFS explains at significant length in

its Oregon BiOp how FEMA's process for mapping floodplains includes many discretionary elements,

and that it could modify its processes to benefit endangered species. *See* FEMA-BE-0031351-31352.

Moreover, while FEMA admits it has "some discretion over Conditional Letter of Map

Changes," which include CLOMRs and CLOMR-f (FEMA-BE-0027887-88), this discretion extends to

other map revision elements of its mapping program as well. For example, the NFIA does not authorize

or require FEMA to allow for filling of floodplains to change floodplain contours and remove a property

from the NFIP's purview, yet FEMA's mapping program allows for this. *See NWF*, 345 F. Supp. 2d at

1173; *see also CSD*, 812 F. Supp. 2d at 1132-33. FEMA could use its discretion to eliminate options of

modifying the floodplain as a means to avoid having to obtain flood insurance in any area that is mapped

as critical habitat for an endangered species.

In sum, FEMA has discretion over the NFIP such that its implementation of the NFIP is an

"agency action" for which consultation is required. FEMA's carrying out of its mapping program and

floodplain management program encourages, facilitates, directs, and guides how and where development

in floodplains occurs. In addition, FEMA retains discretion in its mapping and floodplain management

programs that allow it to require protective measures to benefit listed species or their critical habitat.

### 2.  Implementation of the NFIP Is Ongoing Agency Action.

Agencies have an ongoing ESA § 7 consultation duty concerning the ESA-listed species

impacted by ongoing program implementation. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Service,* 789

F.3d 1075, 1087-88 (9th Cir. 2015); *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1032-33 (9th Cir.

2005); *Turtle Island Restoration Network v. NMFS*, 340 F.3d 969, 977 (9th Cir. 2003); *Pacific Rivers

Council v. Thomas,* 30 F.3d 1050, 1054 (9th Cir. 1994). FEMA's implementation of the NFIP in Santa

Cruz and Monterey counties, in particular its floodplain management program and its mapping program,

1    are ongoing "agency action" implicating FEMA's duty to consult.

2         In Santa Cruz County, FEMA revised and adopted FIRMs in 2012, and is currently engaged in

3    another FIRM revision. 85 Fed. Reg. 7,557 (Feb. 12, 2016). In Monterey County, FEMA revised and

4    adopted FIRMs in 2012 and 2017. 82 Fed. Reg. 12,627, 12,628 (Mar. 6, 2017). As explained above, the

5    process and steps FEMA takes to revise the FIRMs are not dictated by statute. FEMA retains discretion

6    through its FIRM development process to determine where the requirements of the NFIP will be

7    applicable, which in turn has the indirect effect of resulting in modifications to the floodplain (as

8    described above). This is ongoing agency action requiring consultation.

9         Likewise, FEMA continues to implement its program of allowing floodplain modifications in

10   Santa Cruz and Monterey counties through its map revision program. Answer, ¶ 141.  FEMA has

11   recently approved at least seven LOMR/CLOMR map revisions in these counties. *Id.*; Hunt Decl., ¶ 30,

12   Ex. V-GG (identifying 6 LOMRs in Monterey County added to the one in Santa Cruz County makes

13   seven). Given that "FEMA retains authority to modify how and under what circumstances it will

14   consider allowing floodplain modifications in its mapping activities," these activities constitute

15   "'discretionary' action [that] 'directly or indirectly causes modifications to the land and water.'" *CSD*,

16   812 F. Supp. 2d at 1122.

17        FEMA also continues to implement the minimum floodplain management criteria in Santa Cruz

18   and Monterey counties through its continued approval and recognition of each as an NFIP-eligible

19   community. And FEMA retains discretion to modify these criteria, and continuing authority to require

20   these counties to modify their ordinances or suspend their eligibility if it finds they are not meeting

21   FEMA's requirements. 44 C.F.R. §§ 59.24, 60.7. FEMA's implementation of floodplain management

22   criteria in these counties is ongoing agency action. *See Wash. Toxics Coal.*, 413 F.3d at 1032-33

23   (ongoing action where EPA retained authority to modify or withdraw pesticide registrations).

24        Finally, Santa Cruz and Monterey counties participate in the CRS. Answer, ¶ 149; Hunt Decl.

25   Ex. I at CRS 5 (FEMA, NFIP Flood Insurance Manual, Community Rating System). FEMA has

26   discretion to modify the program to include measures to benefit listed species in these counties, and thus

27   indirectly affect floodplain development by incentivizing certain types of development. This too is

28   ongoing agency action for which consultation is required. *See NWF*, 345 F. Supp. 2d at 1174.

In sum, FEMA carries out the NFIP in Santa Cruz and Monterey counties on an ongoing basis and it retains discretion to modify how it implements the NFIP to benefit ESA-listed species.

### 3. FEMA's Implementation of the NFIP May Affect ESA Species and Critical Habitat in Santa Cruz County and Monterey County.

The "may affect" standard triggering consultation duties provides a very low bar. *See Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018-19 (2009) (citing 51 Fed. Reg. 19,926, 19,949 (June 3, 1996) ("Any ***possible*** effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement . . ."); *see also NRDC v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014); *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1028 (9th Cir. 2012) (*en banc*); *CSD*, 812 F. Supp. 2d at 1122, 1127. FEMA's NFIP implementation indirectly causes floodplain modifications. Indeed, floodplain modifications, including urbanization and artificial fill, are identified by the Services as among the primary causes of the decline of SCCC Steelhead, CCC Coho, WSP, and tidewater goby. *See* Section II, *supra*. Notably, the critical habitat for these four species in Santa Cruz and Monterey counties significantly overlap with areas within the SFHA. Hunt Decl. ¶¶ 31-32 and Exs. HH and II. Thus, plainly, these species' critical habitat is prone to being impacted by floodplain development incentivized by FEMA's NFIP implementation.

In fact, FEMA itself recognizes the harm development causes to species that depend on floodplains, devoting over 30 pages to describing the negative effects of floodplain development generally and to listed species and critical habitat. Development can cause "[l]oss and degradation of habitat," "[p]redation . . . from nearby human development [that] provid[es] food and water for predators and increase[es] their abundance," "[c]ontamination," "[p]ollution," and other disturbances, threatening listed mammal, bird, reptile, amphibian, fish, invertebrate, and plant species. See FEMA-BE-0027714–15, 0027757, 0027761–63, 0027765, 0027771, 0027773–81, 0027785–90, 0027793–96, 0027809–12, 002, 0027814–15, 0027817, 0027826–32. Specifically, FEMA recognizes erosion and sedimentation due to development and pollution are threats to anadromous fish species like CCC Coho and SCCC Steelhead and freshwater resident species such as tidewater goby. FEMA-BE-0027801–02, 0027807, 0027799, 0027804. And destruction and modification of nesting and foraging areas from coastal development is a threat to beach birds, including the WSP. FEMA-BE-0027777–78, 0027782.

Furthermore, in the BE, FEMA concluded that many of its programs, including its mapping and floodplain management programs, had a *beneficial* effect on species. *See, e.g.*, FEMA-BE-0027746, 0027879–81, 0027884. Even a beneficial effect satisfies the "may affect" threshold and requires FEMA to consult on the impacts of its action. *See Cal. ex rel. Lockyer*, 575 F.3d at 1018-19.

**B.     FEMA Has Failed to Consult as Required Regarding Its Implementation of the Stafford Act Activities in Santa Cruz County and Monterey County.**

FEMA administers the Public Assistance Program, Individual and Households Program, and Hazard Mitigation Grant Program (collectively "Disaster Preparedness, Mitigation, and Recovery Programs" or "DPMRPs"), which are interrelated to the NFIP. These programs are administered pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1988, 42 U.S.C. § 5121 *et seq.* ("Stafford Act"). Under the Stafford Act, FEMA may provide funds to repair, restore, or replace disaster-damaged public facilities and facilities owned by certain private nonprofit organizations.

FEMA has not completed ESA § 7 consultations with NMFS and FWS for each project funded through the DPMRPs, nor fulfilled its substantive ESA § 7(a)(2) duties with respect to these activities. FEMA has completed only its Tier 1 Programmatic Biological Assessment for FWS for the DPMRPs. In turn, FWS has issued only its Tier 1 Programmatic Biological Opinion for those programs ("Tier 1 BiOp" April 27, 2016). FEMA-SA-0000114 - 0000122. The Tier 1 BiOp expressly states that "[t]his consultation does not contain our evaluation of the effects of the Programs on threatened and endangered species or designated critical habitat throughout the three States." FEMA-SA-0000114. The Tier 1 BiOp further notes that two more rounds of consultation are contemplated and necessary. FEMA-SA-0000114 – 0000119. FEMA has not completed any aspect of ESA § 7 consultation with NMFS concerning the programs in issue. Declaration of Alessandro Amaglio, ¶ 31 (Dkt. 44-1). ESA § 7(d) forbids FEMA from continuing to implement DPMRP grants to projects that may affect ESA-listed species, thus irretrievably committing federal resources to such projects, without completing this programmatic consultation that will take into account the cumulative impacts of the FEMA grant program. *See Conner v. Burford*, 848 F.2d 1441, 1455 n.34 (9th Cir. 1988).

Despite FEMA's statements to the contrary, the agency's AR includes evidence of committing

DPMRP resources for projects without first determining whether ESA § 7 consultation was needed. For example, in November 2016, FEMA approved funding for Phase One of the Humboldt Bay Municipal Water District's ("HBMWD") "Surge Tower Retrofit Project." FEMA-SA-0001181-0001182, FEMA-SA-0001183-0001189. The project is located on the Samoa Peninsula, an area containing designated critical habitat for federally-listed threatened and endangered species, including Menzies Wallflower. Hunt Decl., ¶ 34, Ex. K. Funding was approved and provided for a "soil contamination assessment," which by its very nature is a ground-disturbing activity, typically requiring borings, either collected by hand or mechanical means, as well as vehicle and pedestrian access. Plaintiffs review of the AR in this case found no record of FEMA making a "no effects" determination, or initiating informal or formal consultation with FWS or NMFS before committing resources to this project.

In other instances, FEMA failed to meet the terms and conditions of incidental take statements ("ITSs") in biological opinions addressing DPMRP grants. As a case in point, FEMA funded a grant submitted by Santa Cruz County for a culvert repair project on Tanaka Creek. After determining the project may adversely affect ESA-listed Central California Coast ("CCC") Steelhead and CCC Coho salmon, FEMA initiated formal consultation with NMFS which led to NMFS issuing a biological opinion in 2013 ("Tanaka BiOp"). FEMA-SA-0001662. The Tanaka BiOp included an ITS which set limitations on the number of CCC Steelhead and Coho that were captured, harmed, or killed during creek dewatering and fish relocation activities. FEMA-SA-0001689-95. The ITS required FEMA and the county to, among other obligations, provide written post-construction reports to NMFS documenting implementation of measures to avoid harm to the listed fish. FEMA-SA-0001693-94. As evidenced by FEMA's AR and FEMA's Freedom of Information Act response to EcoRights, such reports or any other documentation of implementation of the ITSs species-protective measures were never produced. Hunt Decl. ¶ 35. If FEMA and the county actually implemented the species-protective measures, some documentation of this would surely exist. The absence of such documentation supports the inference that these measures were not implemented. Failure to implement these measures, or to ensure that its grantees implemented these measures, constitutes FEMA failure to ensure that its ongoing administration of the DPMRPs is not jeopardizing ESA-listed species in violation of its substantive ESA § 7(a)(2) duty. In failing to ensure implementation of the ITS, FEMA also failed to utilize its authority to

implement the DPMRPs in a manner promoting species conservation in violation of its ESA § 7(a)(1)

substantive duty.

**C.    FEMA Has Violated Its ESA § 7 Substantive Duties.**

**1.    FEMA Does Not Ensure Its Actions Do Not Harm Species or Result in Adverse Modification of Critical Habitat as Required by ESA § 7(a)(2).**

ESA § 7(a)(2) imposes a separate substantive duty on FEMA to ensure that its action does not

jeopardize the survival or recovery of listed species. *Ctr. for Biological Diversity v. U.S. Bureau of Land*

*Mgmt,* 698 F.3d 1101, 1127-28 (9th Cir. 2012); *Resources Ltd. v. Robertson*, 35 F.3d 1300, 1304 (9th

Cir. 1994); *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy*, 898 F.2d 1410, 1415

(9th Cir. 1990). The record evidence unequivocally demonstrates that FEMA is not ensuring that NFIP

implementation does not jeopardize the survival or recovery of listed species.

In the course of their many years long negotiation with FEMA over whether consultation is

required, both NMFS and FWS have identified numerous measures that FEMA should be taking when

implementing the NFIP to ensure listed species that rely on healthy floodplain ecosystems are not

jeopardized. *See e.g.,* Hunt Decl. Ex. L at 2 and Ex. J at 2-4. FEMA previously identified changes to its

regulations that it believed would protect species, but changed course rather than consult with the

Services over these proposed changed. FEMA-BE-0027978-79. Moreover, when FEMA agreed to

consult with NMFS regarding the impacts of the NFIP on salmonids in the Puget Sound area and in

Oregon, NMFS found that NFIP implementation was likely to jeopardize the species, and identified

numerous RPAs to be implemented to avoid jeopardy. These RPAs included: regulatory revisions to

enhance ESA compliance, minimize development in SFHAs (*e.g.* limiting footprint of any new

development to 10% of lot size), requiring use of pervious surfaces. FEMA-BE-0031454-57 (Oregon

BiOp); FEMA-BE-31730-31731 (Puget Sound BiOp). Absent these RPAs, FEMA's implementation of

the NFIP will jeopardize the salmonids. In Santa Cruz and Monterey counties, listed salmonids are

likewise adversely affected by NFIP-facilitated development, and yet FEMA has not taken steps to

ensure that its minimum floodplain management criteria, or its mapping program, do not jeopardize

listed salmonids, or any other species. FEMA's failure to undertake measures to ensure listed species are

not jeopardized and will recover is a violation of its substantive duties under ESA § 7(a)(2).

**2.     FEMA Does Not Act to Conserve Listed Species As Required by ESA § 7(a)(1)**

ESA section 7(a)(1) imposes an affirmative duty on FEMA to use its authorities to further the

ESA's purposes by carrying out programs for the "conservation" of the listed species. 16 U.S.C.

§ 1536(a)(1). The term "conservation" means "the use of all methods and procedures which are

necessary to bring any endangered species or threatened species to the point at which the measures

provided pursuant to [the Act] are no longer necessary." 16 U.S.C. § 1532(3). This duty is mandatory

and requires affirmative actions by FEMA. *See Pyramid Lake*, 898 F.2d at 1416-17; *Carson-Truckee*

*Water Conservancy Dist. v. Clark*, 741 F.2d 257, 261-62 (9th Cir. 1984); *Fla. Key Deer*, 522 F.3d at

1146 ("Total inaction is not allowed."); *Sierra Club v. Glickman*, 156 F.3d 606, 616 (5th Cir. 1998). In

addition, those actions must contribute to conserving the listed species in a significant way. *Pyramid*

*Lake*, 898 F.2d at 1418 ("An 'insignificant' conservation measure in the context of ESA is oxymoronic;

if the proposed measure will be insignificant in its impact, how can it serve the ends of conservation, and

thus be a 'conservation measure'?"); *see also Fla. Key Deer*, 522 F.3d at 1147.

Here, FEMA has failed to comply with this duty. For a conservation measure to meet the

requirements of ESA § 7(a)(1), it must be carried out "in consultation" with the Services. *Glickman*, 156

F.3d at 616. Here, FEMA has failed to undertake consultation with the Services to satisfy its

"conservation duties" specifically with respect to the 12 listed species potentially impacted by FEMA's

action in Santa Cruz and Monterey counties. In fact, there is no evidence that FEMA even has *any*

specific conservation measures in place for each of the 12 listed species with designated critical habitat

in the floodplain areas influenced by the NFIP.

Additionally, FEMA has not taken steps to modify the NFIP to address its species shortcomings,

such as those NMFS has identified in Puget Sound and Oregon as being necessary simply to avoid

jeopardy to listed salmonids. As a result, any conservation measures FEMA may be taking to benefit

listed species is undermined by the fact that in carrying out the NFIP it is creating a situation that

adversely affects species and their critical habitat. *See* Section IV.A.3, *supra*. As NMFS found in

Oregon and Puget Sound, implementation of RPAs are necessary to avoid jeopardy. FEMA-BE-

0031162; FEMA-BE-0031572. This jeopardy finding means the implementation of the NFIP is

appreciably diminishing the likelihood of the listed species surviving and recovering. *See* 50 C.F.R.

§ 402.02 (defining "Jeopardize the continued existing of"). The RPAs contained examples of measures that would halt this decline toward extinction for salmonids in Washington and Oregon. FEMA-BE-0031441-0031442 and FEMA-BE-0031454-0031457; FEMA-BE-0031730-0031731. While these RPAs were not designed specifically for the salmonids at issue here, development under the extant requirements of the NFIP is harming (not conserving) the listed salmonids in Santa Cruz and Monterey counties, as well. This further demonstrates FEMA's lack of compliance with ESA § 7(a)(1). *Cf. Carson-Truckee*, 741 F.2d at 261-62 (action agency complied with ESA § 7(a)(1) by operating project so as to avoid jeopardy to threatened fish). FEMA's failure to carry out programs in Santa Cruz and Monterey counties for the "conservation" of the listed species is a violation of its ESA § 7(a)(1) duty.

### D.    Ecological Rights Foundation Has Standing.

EcoRights satisfies standing requirements to bring its claims that FEMA has violated its substantive ESA § 7 duties because (1), its members have suffered an injury in fact that is concrete and particularized, actual or imminent, (2), that injury is fairly traceable to FEMA's challenged actions, and (3), that injury injury will be redressed by EcoRights' requested relief. *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.,* 528 U.S. 167, 180-81 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). EcoRights' members recreate in and otherwise use and enjoy areas throughout Santa Cruz and Monterey counties affected by the NFIP. Kalt Decl., ¶¶ 2, 10, 19; Nichols Decl. ¶¶ 4, 16-21; Beaman Decl. ¶¶ 2, 4-19.  EcoRights' members derive recreational, scientific, conservation, aesthetic, and educational benefits from the existence of the threatened and endangered species that inhabit and/or rely on Santa Cruz and Monterey counties' floodplain habitats. Kalt Decl., ¶¶ 2, 10, 19; Nichols Decl. ¶¶ 16-22, 25-30; Beaman Decl. ¶¶ 4-19. FEMA's failure to comply with its ESA § 7 substantive duties to take actions which will avoid, or at least lessen, the adverse impacts of the NFIP on these ESA-protected species has caused injury in fact to EcoRights' members by hampering the recovery and diminishing the abundance of these species. *See Laidlaw*, 528 U.S. at 181; *Lujan*, 504 U.S. at 562-63; *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147-51 (9th Cir. 2000) ("*ERF*"); Kalt Decl., ¶¶ 2, 10, 19; Nichols Decl., ¶¶ 16-22, 25-30; Beaman Decl., ¶¶ 4-19, 28-32; Taylor Decl., ¶¶ 1-5. Enjoining FEMA from continuing to implement the NFIP without consulting with the Services and then implementing the reasonable and prudent alternatives and/or reasonable and prudent

1  measures specified by the Services in such consultation will redress these injuries. Kalt Decl., ¶ 27;

2  Nichols Decl., ¶ 31; Beaman Decl., ¶ 33.

3       To have standing to bring its claims that FEMA has violated its procedural ESA § 7 duty to

4  consult with the Services, EcoRights need only meet an altered standing test: (1) FEMA violated ESA

5  § 7's procedural rules; (2) these rules protect EcoRights' concrete interests; and (3) it is reasonably

6  probable that FEMA's failure to engage in ESA § 7 consultation will threaten their concrete interests.

7  *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004); *see Lujan*, 504 U.S. at 572, n.7.

8       EcoRights' aesthetic, educational, recreational, and spiritual interests in the endangered species

9  present in Santa Cruz and Monterey counties in areas near where they live or visit and frequently use

10  constitute concrete interests for purposes of procedural standing. *See, e.g., Laidlaw*, 528 U.S. at 181;

11  *Lujan*, 504 U.S. at 562-63; *ERF*, 230 F.3d at 1147-51. ESA § 7 consultation is the process set up by

12  Congress to ensure that federal agency actions are proscribed or modified to take into account advice

13  from the Services so as to avoid jeopardizing the survival and recovery of ESA-protected species. In

14  failing to engage in ESA § 7 consultation over its implementation of the NFIP in Santa Cruz and

15  Monterey counties, FEMA has thus failed to engage in procedures that are designed to protect

16  EcoRights' interests in ESA-protected species in these counties. *See Salmon Spawning & Recovery*

17  *Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008); *see Bennett v. Spear*, 520 U.S. 154, 176

18  (1997) (ESA § 7 consultation requirements were designed to vindicate the ESA's substantive species

19  protection purposes). EcoRights thus has standing simply because the ESA § 7 consultation sought is the

20  type of administrative action Congress directed agencies to make to address the type of harm to species

21  that injures EcoRights' members; EcoRights need not show that ESA § 7 consultation will reduce harm

22  to the ESA-protected species that EcoRights has an interest in protecting. *Cantrell v. City of Long*

23  *Beach*, 241 F.3d 674, 680-82 (9th Cir. 2001); *see also Pac. N.W. Generating Coop. v. Brown*, 38 F.3d

24  1058, 1065 (9th Cir. 1994).

25       EcoRights has standing to bring suit on behalf of its members given its members would have

26  standing to sue in their own right, the interests at stake here are germane to its environmental protection

27  organizational purposes, and neither the claims asserted nor the relief requested (injunctive relief,

28  declaratory relief, legal fees and costs) requires the participation of individual members. *Laidlaw*, 528

1  U.S. at 181 (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)); *see*

2  *also Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171-72 (9th Cir. 2002).[2]

3  **VI.      CONCLUSION/RELIEF REQUESTED**

4          For the foregoing reasons, EcoRights should be granted summary judgment that FEMA has

5  violated ESA § 7 by failing to consult over its implementation of the NFIP and Stafford Act in Santa

6  Cruz and Monterey counties. Additionally, FEMA should be enjoined to commence ESA § 7

7  consultation by submitting an adequate biological assessment to the Services by June 30, 2018, that,

8  based on the best available science, proposes measures for NFIP and Stafford Act implementation

9  needed to avoid jeopardy to ESA-listed species in Santa Cruz and Monterey counties. *E.g.*, *Jewell*, 749

10  F.3d at 782 (injunction compelling unlawfully omitted ESA § 7 consultation is "available" relief);

11  *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1130 (9th Cir. 1998) (ordering consultation where

12  agency failed to properly consult prior to taking action); *Resources Ltd., Inc. v. Robertson*, 35 F.3d

13  1300, 1308 (9th Cir. 1994) (same). FEMA should further be required to cooperate fully with the

14  Services to ensure prompt issuance of a biological opinion addressing FEMA's implementation of the

15  NFIP and Stafford Act in these counties. *See SYRCL v. NMFS*, No. 06-2845, 2011 U.S. Dist. LEXIS

16  49164, at **6-*13 (E.D. Cal. April 28, 2011) (ordering new biological opinion by date certain).

17          Additionally, FEMA should be enjoined to issue any FIRM revisions (including any form of

18  LOMRs), any CRS approvals, or any Stafford Act grants pending completion of ESA § 7 consultation.

19  FEMA should be restrained from taking further discretionary actions that may adversely affect and

20  cause irreparable harm to ESA-listed species until it has completed the required ESA § 7 consultation

21  and received and committed to implement the RPAs and RPMs devised by the Services as necessary to

22  avoid jeopardizing ESA-listed species. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422

23  F.3d 782, 787 (9th Cir. 2005) (injunction appropriate to remedy harm from dams pending completion of

24  renewed ESA § 7 consultation); *Houston*, 146 F.3d at 1130 (invalidating agency water contracts pending

25  valid ESA § 7 consultation, noting the agencies cannot take actions that will jeopardize species without

26

27  [2] In enacting the citizen suit provisions of the ESA, Congress provided the federal courts with

28  jurisdiction to the full extent permitted by Article III, negating any zone of interests tests for ESA citizen suits. *Bennett*, 520 U.S. 154, 164-66 (1997).

1   consulting); *Sierra Club v. Marsh*, 816 F.2d 1376, 1389 (9th Cir. 1987) (enjoining highway project

2   pending completion of valid ESA § 7 consultation); *Sierra Club v. Yeutter*, 926 F. 2d 429, 439 (5th Cir.

3   1991) (affirming injunction of Forest Service activities that violated ESA § 7(a)(2) by jeopardizing the

4   continued existence of endangered woodpecker); *CBD v. U.S. Forest Service*, 829 F. Supp. 1029,

5   1036 (D. Az. 2011) (enjoining livestock grazing on allotments during months when threatened

6   rattlesnake species might be present given Forest Service violations of ESA § 7(a)(2)); *Defenders of*

7   *Wildlife v. Martin*, No. 05-248, 2007 U.S. Dist. LEXIS 13061, at **23-31 (E.D. Wash. Feb. 26, 2007)

8   (enjoining snowmobiling in caribou's habitat and migration corridor pending valid ESA § 7

9   consultation); *Village of False Pass v. Watt*, 565 F. Supp. 1123, 1165 (D. Alaska 1983) (enjoining oil

10  and gas leases until Secretary carried out RPAs suggested in biological opinion to protect whales).

11       The requested injunctive relief is appropriate. The evidence well establishes, as the Services have

12  repeatedly emphasized to FEMA, including in the Puget Sound and Oregon BiOps, that the NFIP has

13  obvious adverse impacts on ESA-listed species and is jeopardizing their survival and recovery. FEMA

14  has not met its burden to prove the opposite in this setting where it has failed to consult with the

15  Services. *Wash. Toxics*, 413 F.3d at 1035 (agency has burden of establishing that an action is non-

16  jeopardizing pending the completion of consultation). These threats to the species well constitutes the

17  requisite irreparable harm for injunctive relief. *SYRCL v. NMFS*, 804 F. Supp. 1045, 1056-67 (E.D.

18  Cal. 2011); *see also Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1090 ("in light of the stated purposes of

19  the ESA in conserving endangered and threatened species and the ecosystems that support them,

20  establishing irreparable injury should not be an onerous task for plaintiffs"). Whatever hardship to

21  FEMA would be entailed in such injunctive relief is necessarily outweighed by the interest in rescuing

22  the ESA-listed species from extinction risk. *E.g.*, *Marsh*, 816 F.2d at 1383 ("[P]rojects that jeopardized

23  the continued existence of endangered species threaten incalculable harm: accordingly,…the balance of

24  hardships and the public interest tip heavily in favor of endangered species. [A court] 'may not use

25  equity's scales to strike a different balance.'").

26  Date: January 12, 2017                          Respectfully submitted,
                                                     /s/ Drevet Hunt
27                                                   Drevet Hunt
28                                                   Attorney for Plaintiff